# AFFIDAVIT
# UNDER SEAL



FILED APR 23 2018 Clerk, U. S. District Court Eastern District of Tennessee At Knoxville

I, Gregg McNamara, being duly sworn, depose and state as follows:

1. I have been a Special Agent with the Tennessee Bureau of Investigation ("TBI") since May 2007. I am presently assigned to the Upper East Tennessee District Drug Investigation Division and have been so assigned since May 2007. Prior to TBI, I was a Special Agent with the Tennessee Department of Revenue from April 2004 to May 2007. In the past, I have participated in numerous investigations of narcotics violations and money laundering. I have conducted investigations utilizing complex investigative techniques and the utilization of analytical methods during narcotics and money laundering investigations. I have experience and training in the debriefing of confidential sources about drug trafficking, surveilling persons involved in drug trafficking, and conducting searches for controlled substances and records of drug trafficking activity. I am familiar with the methods of operation and terminology used by drug traffickers, as well as methods of laundering drug trafficking proceeds.

2. Except as noted herein, all of the information contained in this affidavit is either known to me personally, has been told to me by another law enforcement officer, or I have obtained through reading investigative reports prepared by other law enforcement officers. Moreover, this Affidavit does not contain all of the information known to me or law enforcement about this investigation.

3. On August 27, 2014, United States Magistrate Judge Guyton authorized a Search Warrant for the installation of a pole camera to view the activities on the property located at 6017 Clinton Highway, Knoxville, Tennessee. In accordance with the Search Warrant, a covert

1

video camera, also known as a "pole cam," was installed across the street from the building located at 6017 Clinton Highway, in Knoxville, Tennessee. The period of authorization that was granted by United States Magistrate Judge Guyton on August 27, 2014, for use of the pole camera at 6017 Clinton Highway, in Knoxville, Tennessee expired on October 10, 2014.

4. On October 10, 2014, United States Magistrate Judge Shirley authorized a Search Warrant for the continued monitoring of the pole camera to view the activities on the property located at 6017 Clinton Highway, Knoxville, Tennessee. In accordance with the Search Warrant, law enforcement continued monitoring the "pole cam." The period of authorization that was granted by United States Magistrate Judge Shirley on October 10, 2014, for use of the pole camera at 6017 Clinton Highway, in Knoxville, Tennessee expires on November 8, 2014.

5. This pole camera is capable of capturing live video, recording video, zooming the view perspective, and panning the view perspective. The camera is not capable of recording audio. The camera is not recording visual images on a continuing basis and has been monitored on a periodic basis since August 27, 2014, by law enforcement investigating this drug trafficking organization ("DTO"). The Affidavit from the original pole camera Search Warrant that was authorized on August 27, 2014 is fully incorporated herein and the Affidavit from the second pole camera search warrant that was authorized on October 10, 2014 is also fully incorporated herein.

6. Therefore, this Affidavit is submitted in support of a Search Warrant authorizing the continued use of and recording by a video camera[1] located on a public utilities pole near the

---

[1] The video camera, also known as a pole camera, will not be configured to record audio. The video camera will possess the capability to record video continuously however; if possible, the camera may be configured to record upon activation by the controller or a triggered event such as motion detection. The selected mounting point of the camera will provide a continuous electrical power source and camouflage due to other utility equipment currently mounted to the

2

real property on which a car sales/repair lot with unrestricted public driveway access (as depicted in the photograph attached to this application, marked as Attachment A, which is made a part hereof and is fully incorporated herein) are owned, possessed, occupied, and controlled by an unnamed business or accessed by customers of the unnamed business, which is located in the Eastern District of Tennessee. The address of the unnamed business is 6017 Clinton Highway, Knoxville, Tennessee 37912. As outlined below, the pole camera has provided beneficial information for law enforcement and, because the investigation is ongoing, law enforcement seeks judicial authority to continue the use of the pole camera.

7. Based on my prior training and experience stated herein above, as well as information obtained during this particular investigation, I know individuals who possess and distribute illegal narcotics use business locations, at least some of the time, as a place to conceal or surreptitiously deliver the drugs to other co-conspirators. These individuals also use these businesses to conceal cash proceeds and other assets from their drug trade.

## CONSPIRACY OVERVIEW

8. Since April 2014, a joint investigation has been conducted into a crystal methamphetamine, a.k.a "ice," DTO that is based in the Sevier County, Jefferson County, and Knox County section of the Eastern District of Tennessee. One of the members of this

---

pole. However, your affiant may utilize other utility poles or platforms in the area if the selected pole not deemed suitable at the time of installation. The camera will likely be able to observe the parking lot area and exterior portion of the business while it is closed. The affiant suspects the camera may be able to see, at least partially into the interior of the business through a front window. The business is located in an "open air," unrestricted access area. Activity at the exterior and possibly the interior of this business could be observed by the public or law enforcement officers if they were located in the immediate area (as depicted in the photograph attached to this application marked as Attachment A, which is fully incorporated herein).

3

organization was initially identified by the nickname "Geno." Through information received during this investigation, "Geno" has been identified as Eugene LOISELLE, II ("LOISELLE").

9. Through the use of confidential sources ("CSs"), investigators have made multiple, street-level crystal methamphetamine purchases from at least four individuals in this organization, which includes Leonard SANDS ("SANDS"), and have identified telephone numbers used by LOISELLE, SANDS, and others to conduct methamphetamine transactions. CS information, supported by independent observation and investigation, indicates the local methamphetamine supplier for SANDS is LOISELLE.

10. As previously mentioned, according to CS debriefings, LOISELLE goes by the nickname "Geno" and is receiving up to multi-pound quantities of "ice" per delivery, from an Arizona-based crystal methamphetamine source of supply. LOISELLE is believed to conduct drug transactions directly with SANDS, a notorious ounce-level methamphetamine dealer in Knox and Sevier Counties, Tennessee. In turn, SANDS has several local, smaller, street-level dealers who he supplies with methamphetamine. Additionally, Ashley Queener ("QUEENER") and Angela Covington ("COVINGTON") are selling methamphetamine as a part of this DTO, and Josh Loiselle ("J. LOISELLE") is LOISELLE's son and he had some involvement with this DTO in the past.

4

# CONFIDENTIAL SOURCE[2]

## CS10

11.     CS10 began cooperating with law enforcement on October 24, 2014. CS10 told law enforcement that he has outstanding charges for failure to appear on a misdemeanor theft charge and failure to pay court fines or court costs. CS10 is cooperating with law enforcement in the hope to get a sentencing benefit regarding his pending charges. CS10 was permitted to leave after his debrief with law enforcement and he was not taken into custody. A National Crime Information Center ("NCIC") check indicates that CS10 has been charged with theft from a building, failure to obey court orders, larceny (theft of tools), and larceny (theft of a laptop).

12.     As detailed below, law enforcement interviewed CS10 concerning members of this DTO on October 24, 2014, and found CS10's information to be accurate and reliable. The information contained herein is not all of the information provided by CS10.

13.     On October 24, 2014, at approximately 1:50 p.m., law enforcement met with CS10. CS10 indicated that he wanted to provide law enforcement information about a large-scale methamphetamine trafficking organization that was being supplied from Arizona, by family members. CS10 stated that this organization is led by a white male, in his late-40s to early-50s, known as "Geno." CS10 said that "Geno's" last name may be "Lowry" and that his son is also involved in this DTO. CS10 only knew "Geno's" son as "Geno, Jr." and stated that

---

[2]     For ease of reference, all CSs will be referred to in the masculine gender regardless of true gender. Additionally, at least ten CSs have been used in support of Court authorization regarding different aspects of this investigation. Although not all of the CSs were referenced in this Affidavit or in the previous Affidavit supporting the pole camera Search Warrant, all of them have been referenced in other Affidavits submitted to the Court. Therefore, the CSs will maintain the same number that has been assigned to them in prior Affidavits, even though not all numbers have been included in this Affidavit or the previous Affidavit submitted to the Court in support of the pole camera Search Warrant.

his son's wife's name is "Ashley." Based upon this investigation, it is known that QUEENER, whose first name is "Ashley," is in a romantic relationship with LOISELLE's son, J. LOISELLE. CS10 said that "Geno" was from Arizona and believed he had a lengthy criminal history; he added that "Geno" was a "Peckerwood," which is an affiliate of the Aryan Brotherhood. Law enforcement confirmed that Peckerwood is prison-slang, denoting affiliation with white supremacy groups such as the Aryan Brotherhood.

14. CS10 stated that he was a friend of "Geno," has known him for approximately two and one-half years, and has operated as a "blocker" for him during the shipment of methamphetamine. Law enforcement did not ask CS10 to define "blocker" further, but based on the context of the conversation, it is believed that a "blocker" serves in a security capacity. CS10 said that "Geno" began trusting him after CS10 fought off two people who attempted to rob "Geno" while he was sitting at a traffic light on his motorcycle. CS10 said that "Geno" has periodically tested him to ensure his trust; some examples include leaving CS10 on one occasion in the custody of one and one-half pounds of methamphetamine and, on another occasion, with $70,000 cash. CS10 added that recently he was at the "shop" (which law enforcement knows is the location at 6017 Clinton Highway because, not only do the members of the DTO commonly refer to this location as the "shop," but, later in the interview, while CS10 was riding in a vehicle with law enforcement, CS10 directed law enforcement to 6017 Clinton Highway as the place he knows to be the "shop") and was using pills when Allison Erin VAUGHAN ("VAUGHAN"), who was being secretive, asked him to provide her with some of the drugs. CS10 refused because she was being secretive and believed that "Geno" would not approve of it. VAUGHAN and CS10 got into a verbal confrontation, which was interrupted by "Geno," who overheard the conversation. CS10 said that "Geno" praised him for his loyalty.

6

15. CS10 stated that VAUGHAN had a Facebook page. Law enforcement located VAUGHAN's open-source Facebook page and showed it to CS10. CS10 positively identified VAUGHAN from the photo and stated that the white male who appeared in a picture with VAUGHAN was "Geno." Law enforcement familiar with LOISELLE's appearance confirmed that the male in the photograph was LOISELLE. CS10 showed law enforcement a medical bill from Vista Radiology, dated October 5, 2014, bearing the name and address: Allison E. VAUGHAN, 5205 Hickory Woods Rd, Strawberry Plains, TN 37871-3742. CS10 stated that he obtained this bill from 6017 Clinton Highway.

16. CS10 stated that VAUGHAN and "Geno" have been driving a black Cadillac with tinted windows. Notably, on October 22, 2014, law enforcement observed a black Cadillac STS bearing Tennessee license plate P05-51Y, registered to Jason Jennings, parked at 6017 Clinton Highway. CS10 said that LOISELLE also drives a 2002 Harley Davidson Streetglide with flames and a 2005 Chopper. CS10 said that LOISELLE recently paid cash for the chopper at the Harley Davidson of Knoxville shop. CS10 said that LOISELLE uses the shop located at 6017 Clinton Highway as a location to meet with members of his DTO. Although LOISELLE intentionally makes it appear as a used car lot, that is not the primary purpose of the shop on Clinton Highway. He added that this location was rented. CS10 stated that he suspects that most of the vehicles and jet skis located at 6017 Clinton Highway are stolen. While riding in a vehicle with law enforcement, CS10 directed law enforcement to the shop at 6017 Clinton Highway.

17. CS10 stated that LOISELLE has sold him methamphetamine for the past two years and he charges $500 per one-half ounce or $1,000 per "whole" ounce. CS10 said that, for the past two years, LOISELLE has been bringing in twelve to thirteen pounds of "ice" per week from Arizona. CS10 estimated that LOISELLE is responsible for 90% of the methamphetamine

7

being sold in Knoxville, Tennessee. CS10 said that members of the DTO would either drive or fly to Arizona to obtain the "ice" and drive it back to Knoxville, or the drugs would be shipped to various addresses in East Tennessee.

18. CS10 said that LOISELLE also takes vehicles to a car lot in Lake City, Tennessee, to be sold. CS10 stated that the car lot is located off of I-75, exit 129, then go right. Law enforcement is aware that the directions provided by CS10 are directions to a car lot affiliated with Bobby "Cotton" ANDREWS ("ANDREWS"), a member of this DTO. Notably, Michael HILL ("HILL") had just left this car lot when HILL was arrested on September 23, 2014, and was found to be in possession of approximately two pounds of methamphetamine (this incident is fully detailed below). CS10 said that LOISELLE does not own this car lot but all of the vehicles located on it belong to him.

19. CS10 said that LOISELLE lives in hotel rooms at various locations on Merchants Drive in Knoxville. LOISELLE uses these hotel rooms due to their close proximity to the shop on Clinton Highway. CS10 said that LOISELLE will rent multiple rooms to sleep in, as well as to store money and drugs; LOISELLE changes the hotel rooms weekly.

20. CS10 stated that LOISELLE has six to seven storage units located at Star Storage Units on Central Avenue Pike, Knoxville, Tennessee. LOISELLE uses these storage units to hold stolen merchandise, such as furniture and other items. CS10 said that he had heard a rumor that a dead body had been kept in a deep freezer, in the storage units. Law enforcement was aware that LOISELLE had storage units at this facility prior to CS10 giving this information. These storage units are approximately one block away from the Best Western hotel where LOISELLE was staying.

21. CS10 also knew that "Angie Ray," who was identified by law enforcement to be COVINGTON, "Worm," who was identified by law enforcement to be Jeremy RIVERA ("RIVERA"), and CS4 are members of LOISELLE's DTO. While riding in a vehicle with law enforcement, CS10 directed law enforcement to "Angie Ray's" residence, which was located at 5024 Fleetwood Drive, Knoxville, Tennessee. This residence is the same residence known previously by law enforcement to be COVINGTON's residence. CS10 also stated that COVINGTON has had packages of methamphetamine delivered to this address. CS10 identified CS4 by name and said he knew that CS4 was involved in LOISELLE's DTO (CS10 was not aware that CS4 had provided information to law enforcement).

22. CS10 said that a white male, known to him as "JB" takes cash and methamphetamine to Atlanta. Some of the methamphetamine is delivered to a location on the south side of Atlanta. CS10 said that a 2013 Audi A4 car and a Land Rover have been used to take methamphetamine to Atlanta. While riding in a vehicle being driven by law enforcement, CS10 directed law enforcement to the Best Western hotel on Pratt Road, where the Audi was last seen; the car was not at the hotel upon law enforcement's arrival. Although CS10 identified him as "JB," law enforcement believes he may have been referring to "JP," Jamie PIERATT ("PIERATT"). PIERATT owns a Land Rover, which was being driven by HILL on September 23, 2014 when HILL was arrested and found in possession of approximately two pounds of methamphetamine (this incident is fully detailed below). Also, an Audi car, with Tennessee license plate S65-48K, which is registered to Sixt Rent A Car, was seen by law enforcement on October 21 and 22, 2014 at the Best Western hotel on Pratt Road. CS10 said that, during the past week, LOISELLE had rented rooms 208, 209, and 210 at the Best Western on Pratt Road. CS10 showed law enforcement a Best Western key card marked with "217" on the sleeve, which he

9

stated was the room he had stayed in while with LOISELLE. CS10 said that LOISELLE had recently rented rooms at the adjoining Hampton Inn hotel, and he said LOISELLE used a safety deposit box there to store money. CS10 said that LOISELLE also uses "Green Dot" cards to send money to Arizona for payment of the methamphetamine.

### SIGNIFICANT EVENTS OCCURING ON SEPTEMBER 23, 2014

23. Based on information received from a Source of Information ("SOI")[3], whose reliability has been established and whose identity will be disclosed orally to the United States Magistrate Judge at the time the Search Warrant is presented, on September 23, 2014, law enforcement was conducting surveillance on LOISELLE in anticipation of PIERATT and LOISELLE attempting to travel to Phoenix, Arizona on this date. Law enforcement observed LOISELLE in the presence of HILL and PIERATT while at the Best Western hotel located at 5317 Pratt Road, Knoxville, Tennessee. Law enforcement also observed PIERATT's vehicle, a blue Land Rover bearing Tennessee license plate H16-02U, registered to Jaime S. Pieratt, 3667 Meadowland Drive, Morristown, TN 37814, at the Best Western hotel.

24. On September 23, 2014, law enforcement observed LOISELLE, HILL, PIERATT and others mentioned herein at the Best Western hotel. Also on this same date, PIERATT went from the Best Western hotel to the nearby U.S. Bank branch and back to the hotel.

25. In the afternoon of September 23, 2014, law enforcement observed LOISELLE, HILL, and the aforementioned Land Rover travel from the Best Western hotel to the "shop" located at 6017 Clinton Highway, Knoxville, Tennessee, and then return to the Best Western hotel. Law enforcement then observed HILL and an unknown female enter PIERATT's Land

---

[3] In this Affidavit, any time an "SOI" is referenced, the reference is to the same SOI, i.e. only one SOI is referenced in this Affidavit.

Rover and law enforcement observed another unknown female in a Ford Explorer; both vehicles departed the Best Western hotel and traveled north on Interstate 75 to exit 129. They travelled a short distance from exit 129 to a used car lot, known by law enforcement to be affiliated with ANDREWS,[4] who is a drug associate of LOISELLE. Law enforcement terminated the surveillance of HILL at the aforementioned used car lot at approximately 5:40 p.m. due to fear of compromising the investigation by possibly being detected by a member of this DTO.

26. At approximately 6:21 p.m., a Tennessee Highway Patrol trooper observed HILL, driving the Land Rover, commit a traffic violation while travelling north on Interstate 75, and the trooper conducted a traffic stop. When the trooper approached the vehicle, HILL was talking on a cellular telephone. HILL told the trooper that he was speaking with his "boss," who he identified as PIERATT. HILL did not have the insurance information for the vehicle so HILL handed the cellular telephone to the trooper so that the trooper could speak with PIERATT. PIERATT said he would take a picture of the insurance card and send it to that cellular telephone. The trooper found that HILL was driving with an invalid driver's license, among other traffic violations, and HILL was arrested. Prior to impounding the vehicle, the trooper conducted an inventory of PIERATT's vehicle, which HILL was driving, and found

---

[4] Law enforcement with the Campbell County Sheriff's Office confirmed its knowledge that ANDREWS is affiliated with this used car lot. Additionally, CS9 has said that this used car lot is a place LOISELLE goes and he knew it to be affiliated with ANDREWS. CS9's qualifications are as follows: CS9 began cooperating with law enforcement on August 27, 2014. CS9 is cooperating with law enforcement because he hopes to receive a sentencing reduction based on his cooperation. CS9 has not completed any controlled purchases of drugs and has not recorded telephone calls, but CS9 did provide detailed information regarding this DTO in an interview on August 27, 2014, which I find to be true and correct based on corroborated information received from other CSs and independent observation. An NCIC check indicates that CS9 has previous arrests for the following criminal offenses: Burglary, Unlawful Possession of a Weapon, two counts of Theft, Theft of Property, Evading Arrest, Reckless Endangerment, Probation Violation, Aggravated Burglary, Theft Under $500, and Failure to Appear.

11

approximately two pounds of suspected crystal methamphetamine concealed in a hydration bladder. Additionally, the cellular telephone that HILL was using was seized as well.

27. HILL did not make any post arrest statements on September 23, 2014. On October 10, 2014, law enforcement obtained a search warrant for the cellular telephone, (859) 227-1618, that was in HILL's possession at the time of his arrest. Electronic data was extracted from this telephone, pursuant to the search warrant, which revealed that on September 23, 2014 one outgoing call was made to a telephone number known to have been used by LOISELLE. Also, eleven outgoing calls were made to (423) 312-6457, two unanswered incoming calls were received from (423) 312-6457, and one text message was received from (423) 312-6457; this telephone number is saved under the title "Boss" in HILL's telephone and is a telephone number known to be used by PIERATT. Law enforcement has not completed a full analysis of this captured information from HILL's telephone.

## ACTIVITIES AT 6017 CLINTON HIGHWAY

28. On September 15, 2014, law enforcement monitoring the pole camera directed at the building at 6017 Clinton Highway observed LOISELLE, VAUGHAN, COVINGTON, and two unknown males having a group discussion at the front of the building.

29. On September 17, 2014, law enforcement monitoring the pole camera observed VAUGHAN and QUEENER at 6017 Clinton Highway. VAUGHAN and QUEENER were observed leaving the location together in a gray Ford F-150.

30. On September 19, 2014, the SOI provided that LOISELLE would be leaving the building at 6017 Clinton Highway and traveling to meet with SANDS. At approximately 4:10 p.m. on the same day, law enforcement monitoring the pole camera observed LOISELLE leaving 6017 Clinton Highway alone on a motorcycle.

31. On September 21, 2014, law enforcement monitoring the pole camera observed PIERATT arrive at 6017 Clinton Highway driving a blue Land Rover bearing Tennessee tag H16-02U. Soon after, LOISELLE was observed arriving at 6017 Clinton Highway on a motorcycle. PIERATT and LOISELLE were observed moving a large black duffle bag from the back of the Land Rover and carrying it to the rear of the building. PIERATT and LOISELLE then left 6017 Clinton Highway together in the Land Rover.

32. On September 23, 2014, the aforementioned events occurred wherein HILL was driving a vehicle that contained approximately two pounds of suspected crystal methamphetamine hidden in the vehicle. That same day, this vehicle had been at the shop at 6017 Clinton Highway and ANDREWS' car lot prior to the traffic stop.

33. On October 2, 2014, a SOI provided that SANDS was requesting an unknown amount of suspected methamphetamine from LOISELLE and that VAUGHAN would bring the methamphetamine to SANDS. At approximately 6:21 p.m. on the same day, law enforcement monitoring the pole camera observed VAUGHAN and an unknown female leave 6017 Clinton Highway in a black Cadillac. At approximately 7:00 p.m., law enforcement observed VAUGHAN and the unknown female drive to the road where SANDS lives (law enforcement did not continue surveillance because SANDS lives on a sparsely-populated, dead-end road and it is likely the investigation would have been compromised if SANDS or his neighbors realized law enforcement was monitoring activity at or near SANDS' residence).

34. On October 11, 2014, at approximately 2:55 p.m., law enforcement monitoring the pole camera observed SANDS and another member of this DTO at 6017 Clinton Highway. The SOI provided that while SANDS was at 6017 Clinton Highway, he received a telephone call from an unknown female inquiring what SANDS was doing. SANDS informed the unknown

13

female that he was walking around the shop. The unknown female then asked SANDS if he ever got anything. SANDS replied, that is what we are trying. Based on the information provided by the SOI, I believe SANDS was informing the unknown female that he was at the shop at 6017 Clinton Highway trying to obtain methamphetamine.

35. On October 11, 2014, at approximately 3:02 p.m., law enforcement monitoring the pole camera observed QUEENER and J. LOISELLE arrive at 6017 Clinton Highway in a grey Ford F-150 pickup truck. Upon arriving at 6017 Clinton Highway, SANDS was observed walking to the Ford F-150 pickup truck and speaking with QUEENER and J. LOISELLE.

36. On October 21, 2014, at approximately 4:55 p.m., law enforcement monitoring the pole camera observed VAUGHAN and an unknown female exit the building at 6017 Clinton Highway carrying a large mailing envelope. VAUGHAN and the unknown female entered a black Cadillac with the mailing envelop and left the area of 6017 Clinton Highway traveling south.

37. On October 25, 2014, a SOI provided that SANDS had talked to LOISELLE about going to Wal-Mart. LOISELLE informed SANDS that LOISELLE was waiting on Wal-Mart to come to LOISELLE. Through the course of this investigation, law enforcement has observed LOISELLE and SANDS use the term "going to Wal-Mart" as code for obtaining methamphetamine. Later the same day, October 25, 2014, law enforcement monitoring the pole camera observed four unknown males arrive at 6017 Clinton Highway in a white pickup truck. The four males exited the pickup truck and walked around the business in such a manner as to appear that they were looking for someone. One of the unknown males was observed walking to the back of the pickup truck and appeared to remove something from the pickup truck. The unknown male was then observed going to the back of a Jaguar, with an open back trunk, parked

14

on the property of 6017 Clinton Highway. Law enforcement could not observe if the unknown male placed anything in the truck of the Jaguar. The unknown male then left the Jaguar, with the trunk open, and returned to the pickup truck. All four unknown males then left the area of 6017 Clinton Highway in the white pickup truck. At approximately 1:23 p.m., law enforcement monitoring the pole camera observed QUEENER, VAUGHAN, and two unknown males at 6017 Clinton Highway. QUEENER, VAUGHAN, and the two unknown males were observed walking around the back of QUEENER's Ford F-150 pickup truck parked near the Jaguar with the open rear trunk.

38. On November 5, 2014, a SOI provided that ANDREWS had talked to LOISELLE about a mistake on a title for a 2004 Chrysler Sebring. ANDREWS then asked LOISELLE to stay at the shop at 6017 Clinton Highway because ANDREWS needed to talk to him about something. At approximately 11:30 a.m., law enforcement monitoring the pole camera observed ANDREWS arrive at 6017 Clinton Highway in a red pickup truck. As ANDREWS exited the vehicle and walked toward the building at 6017 Clinton Highway, law enforcement observed LOISELLE exit a vehicle parked at 6017 Clinton Highway carrying a large bag. LOISELLE and ANDREWS then entered the building at 6017 Clinton Highway. A short time later, ANDREWS was observed leaving the building carrying a propane heater. ANDREWS placed the heater in the bed of the red pickup truck and left the area in the red pickup truck.

**AUTHORITY REQUESTED**

39. On December 19, 2012, a panel of the United States Court of Appeals for the Sixth Circuit issued an opinion, *United States v. Anderson-Bagshaw*, No. 12-3074. One of the issues addressed in that opinion was the use of a video camera installed on a public telephone pole over an extended period of time to capture evidence for use in the prosecution of the

defendant in a fraud-related case. Although not the holding of the case, two judges on the panel commented about the warrantless use of such an electronic device for evidence gathering purposes. The Court declined to decide in this opinion whether long-term video surveillance of curtilage requires a warrant, but one judge said in a concurring opinion that use of the pole camera in that case was an unreasonable search which violated the defendant's Fourth Amendment rights. In light of this opinion, and given that there is probable cause to believe that LOISELLE, SANDS, and others are violating Title 21, United States Code, Sections 841 and 846, I now seek authorization, pursuant to Rule 41 of the Federal Rules of Criminal Procedure, to install, maintain, and monitor live or recorded video by video camera to capture evidence of LOISELLE's, SANDS's, and others' continued violations of the aforesaid statute, for a period not to exceed 45 days.

40. Therefore, based on all of the foregoing, there is probable cause to believe that currently upon the premises of the above-listed building, in the Eastern District of Tennessee, LOISELLE, SANDS, RIVERA, and other co-conspirators have been and currently are violating state and federal crimes, the video recording of which constitutes evidence, fruits, and instrumentalities of violations of Title 21, United States Code, Sections 841 and 846.

41. Pursuant to Title 18, United States Code, Section 3103a, I hereby request authorization to delay notice until 30 days after the use of the pole camera has ended, due to the fact that notice at the time of the authorization to use the camera or while the camera is in use will defeat the purpose of the investigation.

42. Pursuant to Title 18, United States Code, Section 3103a, I hereby request authorization to delay notice an additional 30 days after the use of the pole camera has ended for the original pole camera authorization granted by United States Magistrate Judge Guyton on

August 27, 2014, due to the fact that notice will defeat the purpose of the investigation. Also, pursuant to Title 18, United States Code, Section 3103a, I hereby request authorization to delay notice an additional 30 days after the use of the pole camera has ended for the second pole camera authorization granted by United States Magistrate Judge Shirley on October 10, 2014, due to the fact that notice will defeat the purpose of the investigation.

FURTHER AFFIANT SAYETH NAUGHT.

Executed this 7th day of November, 2014, in Knoxville, Tennessee, located within the Eastern District of Tennessee.

_____
Gregg McNamara
Special Agent
Tennessee Bureau of Investigation

Subscribed and sworn to before me
on this 7th day of November, 2014.

_____
C. CLIFFORD SHIRLEY
UNITED STATES MAGISTRATE JUDGE

17


Attachment A